IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CASEY PARKER,                  :
                               :          Case No. 4:04-CV-2144
          Plaintiff,           :
                               :
     v.                        :
                               :          (Judge McClure)
CITY OF WILLIAMSPORT,          :
WILLIAMSPORT BUREAU            :
OF FIRE,                       :
                               :
          Defendants.          :

# M E M O R A N D U M

December 21, 2005

**BACKGROUND:**

On September 29, 2004, plaintiff Casey Parker, filed a five-count complaint in the Middle District of Pennsylvania.  Parker asserts in the complaint that when the defendants terminated his employment they violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. C.S.A. §§ 951-963, the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq., and pursuant to 42 U.S.C. § 1983, Parker's substantive and procedural due process rights protected by the Fourteenth Amendment of the

1

United States Constitution.  The parties stipulated and dismissed Williamsport Bureau of Fire on December 29, 2004.

On October 12, 2005, defendant City of Williamsport ("City") filed the instant motion for summary judgment.  The matter is now fully briefed and ripe for our decision.  For the following reasons the court will grant defendant's motion for summary judgment and enter judgment in favor of the defendant City of Williamsport and against the plaintiff Casey Parker as to all counts.

**DISCUSSION:**

## I. LEGAL STANDARD

It is appropriate for a court to grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

"If the nonmoving party has the burden of persuasion at trial, 'the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden of proof at trial.'" Jalil v. Avdel Corp., 873 F.2d 701, 706 (3d Cir. 1989) (quoting Chippolini v. Spencer Gifts, Inc., 814 F.2d 893,

896 (3d. Cir. 1987)); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

In evaluating a motion for summary judgment the court will draw all reasonable inferences from the evidence in the record in favor of the nonmoving party. <u>Am. Flint Glass Workers Union v. Beaumont Glass Co.</u>, 62 F.3d 574, (3d Cir. 1995). The nonmoving party, however, cannot defeat a motion for summary judgment by merely offering general denials, vague allegations, or conclusory statements; rather the party must point to specific evidence in the record that creates a genuine issue as to a material fact. <u>See</u> <u>Celotex</u>, 477 U.S. at 32; <u>Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.</u>, 172 F.3d 238, 252 (3d Cir. 1999).

## II. FACTUAL BACKGROUND

Beginning approximately September 11, 2000, and until August 18, 2002, Parker was employed by the City as a Codes Officer. Effective August 19, 2002, Parker relinquished his position as Codes Officer and voluntarily accepted an appointment to the City's Bureau of Fire as a firefighter.

All firefighter candidates underwent a medical examination. As part of the medical examination process, Parker completed a medical history questionnaire. In his questionnaire, Parker represented that: (1) he had not required any special or restricted job assignment due to illness, injury, or physical impairment; (2) he had no current medical restrictions; (3) he was not currently taking medications; (4) he

was not currently under medical treatment; and (5) he had no hospitalizations, serious injuries, or operations.  On August 9, 2002, Parker completed a Fire Academy application and represented that: (1) he was physically fit to undertake physical training; (2) he was not currently taking medications; and (3) he was not currently under a doctor's care.  On August 15, 2002, Parker was examined by a physician and found to be medically qualified for the firefighter position.

In order to continue employment as a firefighter with the City, Parker was required to successfully complete training at the Fire Academy of the Harrisburg Area Community College ("HACC").  If there are any new firefighters hired by the City, they are sent to the Fire Academy in the Fall or Spring for initial training. Parker was enrolled in the 27th HACC Fire Academy along with three other Williamsport cadets in a class of nineteen cadets total.

Before attending the Fire Academy, Parker, along with the other probationary firefighters, was provided with an orientation to the Department including its rules and regulations and was assigned housekeeping chores.  During the two week orientation, probationary firefighters would observe at fires and do supportive tasks, but did not engage in fire suppression at fire scenes until completing training at the Fire Academy.

All firefighters who have successfully completed training at the Fire Academy

are assigned the task of fire suppression as part of their job responsibilities. Before

attending the Fire Academy, all four probationary firefighters were told that they

were required to successfully complete the Fire Academy. Similarly, Parker

testified under deposition that: (1) during his Summer 2002 interview with Chief

Kemp, Deputy Chief Gleason, and Deputy Chief Heinbach, he was told that it was

required that he complete training at the HACC Fire Academy; (2) the requirement

of completing training at the Fire Academy was told to all four of the probationary

firefighters; and (3) a condition of his employment as a firefighter was that he

complete and graduate from the Fire Academy.

If a probationary firefighter was absent from the HACC Fire Academy he

was required to report the absence to both the Academy and the City's Bureau of

Fire. In September 2002, the Fire Academy issued Parker and the other cadets

rules and regulations. The Fire Academy rules governing attendance provided:

> HACC Fire Academy is an intensive study of basic fire,
> rescue, emergency medical skills and knowledge. Each
> area and skill is a building block for those that follow.
> Therefore, it is essential that each cadet make every effort
> to attend each class. Any cadet missing three (3) days of
> classes will be subject to review for continuation in the
> academy.

On September 3, 2002, the 27th Fire Academy commenced and Parker began his

training at the Academy. The Academy program for Williamsport probationary

firefighters was scheduled to run twelve weeks, typically Monday through Friday, until November 22, 2002.  Tuition and fees are paid by the fire departments who send cadets to the Academy.  Following training and testing the cadets are certified as "National Firefighter I" and "National Firefighter II" in accordance with the standards set forth by the National Fire Protection Association.  HACC normally runs a Fire Academy class in the Fall and in the Spring and some classes are held without any firefighters from the City of Williamsport.[1]

On Sunday evening, September 8, 2002, Parker called Chief Kemp to request time off from the Academy.  Kemp told Parker that it was a requirement of his employment to complete the Academy and that the Academy was strict about attendance requirements.  The next day Parker sprained his knee at 9:30 A.M..  The injury was temporary.  As a result of his injury Parker missed the remainder of

---

[1]Plaintiff, by way of further response, notes that under deposition Perry Pierich, Academy Supervisor, indicated that in the past the Academy has run a special session for just one cadet at the request of a fire department.  Pierich also indicated that if the City of Williamsport did not wish to wait until the next scheduled Academy to train a cadet it could request a special session and the Academy would evaluate whether it was feasible and within its schedule.  The City did not request a special session for Parker.

training on September 9, 2002 and the entirety of training on September 10, 11 , 12, and 13, 2002, as well as training on Monday September 16, 2002.[2]

On September 16, 2002, a physician cleared Parker to resume full duty training at the Academy without restrictions.  Parker returned to the Academy on September 17, 2002.  Parker worked on making up the classes he missed with the help of fellow cadets.

On September 24, 2002, Academy Instructor James Johnson directed the cadets to complete a ladder transfer exercise.  Johnson called Pierich to the training ground because Parker indicated he would have trouble completing the ladder transfer.  Parker told Johnson that he was not going to complete or could not do the task.  Parker testified that he "had some difficulty" with the ladder transfer; that he told Johnson that "he preferred not to go back up that day" and "didn't really feel comfortable"; and that he was told he could do it tomorrow.  Parker then spoke with Pierich about his depression and he left the training ground.  All of the other cadets completed the ladder transfer skill requirement that day.

On the following day, September 25, 2002, Parker was absent from the

---

[2]Plaintiff, by way of further response, notes that Parker was directed to report to Susquehanna Health System Work Center, which he did, and was thereafter referred to Dr. Bailey for recheck on September 16, 2002.

Academy.  Parker testified under deposition that he had thoughts about running his Jeep into a tree or anything he could do to hurt himself.  He was examined in the emergency room at approximately 7:30 A.M. and was discharged at 8:10 A.M..  Following the examination in the emergency room Parker was prescribed medication, was directed to follow up with Dr. Schwab, and was only to return to normal duty when cleared by his primary physician.  Plaintiff was directed to see his primary physician on September 30, 2002.

Later that morning, but before 9:00 A.M., Parker telephoned Pierich from his home in Williamsport.  Parker reported that he had been in the hospital emergency room and described receiving psychological treatment.  Parker told Pierich he was having "some pretty severe depression" and "had to see" his primary care physician before returning to the Academy.  During the conversation, Parker reported that he would have to be absent from the Academy for an extended period.  Pierich told Parker that he already had missed a block of time and that missing a larger block would make it impossible to make up all of the skills.  Parker specifically told Pierich that he could not return to the Academy until September 30th at the earliest.

Pierich then telephoned Chief Kemp and advised him of Parker's telephone call.  This was the first notification that the Bureau of Fire received about Parker's

8

absence from the Academy that day.  After Chief Kemp was notified, Parker was directed to meet with him because of his failure to report his absence from the Academy.

On the afternoon of September 25, 2002, Parker, Chief Kemp and Deputy Chief Heinbach met in Chief Kemp's office.  The purpose of the meeting was to determine why Parker had not reported to the Academy that day.  Parker asserts that at the meeting Chief Kemp verbally abused him using obscenities and told Parker that he should resign or be fired.  The meeting lasted less than fifteen minutes and Heinbach took notes of Kemp's and Parker's conversation.  During the meeting Parker informed Kemp that he had gone to the emergency room for treatment of depression and provided Kemp with notification that he could not return to work until he was seen by his primary care physician on September 30, 2002.  Parker was told to report to Chief Kemp after he had been evaluated by his primary care physician.

Defendant contends, on the basis of Kemp's deposition testimony, that at this meeting Parker was asked to explain his absences and was provided with an opportunity to do so.  Plaintiff refutes this claim and asserts that Kemp essentially told him his termination from employment was a foregone conclusion and that he should resign or be fired.  Plaintiff purportedly tried to explain to Kemp that he

needed time for treatment and attempted to raise the possibility of withdrawing

from the Academy and re-enrolling.  Kemp, however, made it clear that it was not

open for discussion and told Parker that this was his "one shot" to complete

training at the Academy.  Kemp purports to have told Parker at this meeting that his

absence from the Academy could place him in jeopardy of failing out.  Parker

provided Kemp with the instructions from the emergency room and said that he

could not return to the Academy until at least September 30, 2002.[3]

Parker was absent from ten of the first twenty training days at the Academy.

Following the conclusion of the meeting, Pierich faxed a letter to Kemp advising

that Parker had been dismissed from the Academy.[4]  Parker was dismissed by the

Academy because of his extended absence and because he would be unable to

make up the time.  The reason for Parker's absence played no role in the

Academy's independent determination.  No one from the City participated in the

decision to fail Parker from the Academy.

Defendant claims that following receipt of the letter from the Academy the

City reviewed Parker's employment status.  Parker disputes this claim and says it

---

[3]Under deposition, Parker testified that he did not believe he was medically

able to attend the Academy between September 25, 2002 and September 30, 2002.

[4]Two other cadets also failed the Academy.

was a foregone conclusion that he was going to lose his job.  On October 1, 2002, Parker, Kemp, Gleason and Heinbach met in Kemp's office.  At that time Parker was told that he was failed by the Academy, and he was provided with a termination memo.  Kemp informed Parker that he was being terminated from employment as a firefighter for failure to complete and graduate the Fire Academy. The parties dispute the degree to which Parker was allowed the opportunity to discuss his employment status.  Parker testified, however, that he read the termination memo and had an opportunity to respond to it and make comments about it to Kemp.  Parker notes that at some point in his discussions he had tried to get Kemp to allow him to enroll in the Academy's Spring course, but he was told that the Fall course was his one shot.

In and around October 1, 2002, the City did not know when the next firefighter would be hired or sent for training at the HACC Academy.[5]   Parker had

---

[5]Plaintiff notes that ultimately the City sent another firefighter to the Academy in the Spring of 2003, the next Academy session after the 27th Academy in the Fall of 2002, but that no new firefighters were hired during the remainder of 2002.  Since the Spring of 2003, approximately six firefighters have been hired by the City and all of them have successfully completed the HACC Academy.  In fact, except for Parker, every new fighter for the City has successfully completed the HACC

not been released for work as a firefighter as of September 30, 2002.  On

September 30, 2002, Parker saw Debra Schwab, M.D..  She issued a letter which

Parker requested be faxed to Chief Kemp.  The letter communicated that Parker's

medical condition would preclude him from participating in the Academy until

further notice and that Parker would be reevaluated.[6]  Defendant contends that

according to the fax notation on the letter it was transmitted on the afternoon of

October 1, 2002 after the meeting where Parker's employment was terminated.[7]

───────────────────

Academy since the requirement went into effect in 1991.  Pierich testified that he

was not aware of any cadet who had failed the Academy and then returned to

graduate.

[6]Parker testified that in his view he was capable of performing the job of an

emergency medical technician and was not limited in any other activities from mid-

October 2002 until the end of that year.  Parker received unemployment

compensation benefits from October 2002 until December 2002.  Neither Parker or

his health care providers ever advised the City that he was able to return to work.

[7]The court's copy does not appear to have a notation of the time the fax was

sent.  Regardless of the time it was sent on or after September 30, 2002, Parker had

already failed the Academy as of September 25, 2002, as confirmed by a letter

from Pierich to Kemp on that day.  (Rec. Doc. No. 23-26, Ex. Z.)

Plaintiff has been diagnosed with depression and anxiety disorder.[8]  During 2003 he was evaluated regarding his anxiety disorders.  Plaintiff asserts that when an episode occurs it interferes with his thought processes and his ability to think and concentrate.  Plaintiff's Emergency Room doctor noted he had a several week history in September 2002 of "poor concentration" and "erratic sleep."  (Rec. Doc. No. 30-4, Ex. 3, at 4.)  Under deposition, Parker indicated that at some time in approximately 2000 he had a panic attack while driving home from work in Lock Haven; as a result he had to stop driving and call an ambulance.  Defendant was not aware of this incident when it made the decision to terminate Parker's employment.

---

[8]Defendant notes that at the time the decision to terminate Parker's employment was made the only information presented to the City relating to Parker's depression was the Emergency Room intake sheet which indicated: "Impression: Depression, History of Anxiety."  We note that the plaintiff only provided the court with the first page of the typed September 25, 2002 Emergency Room report which did not include this exact language, but indicated depressive symptoms and a history of anxiety.  (Rec. Doc. No. 30-4, Ex. 3, at 4.)  The defendant did provide hand written medical records from the emergency room on September 25, 2002.  (Rec. Doc. No. 23-18, Ex. R.)  Those documents indicated "depression" after "dx," a common medical abbreviation for diagnosis. (Id. at 1.)

Parker initially thought his condition was temporary but he now believes it to be permanent.  In 2003, well after the City's decision to terminate his employment, Parker saw a marked improvement in his condition through the use of prescription medication and cognitive-behavior therapy to control his episodic panic attacks.

## III.  PARKER'S FMLA CLAIM (COUNT I)

In Count One of his complaint Parker asserts that "[d]efendants violated Plaintiff's rights under the FMLA by failing and refusing to afford Plaintiff leave under the FMLA for his medical condition, and terminating him prior to when such leave would have been exhausted."  (Rec. Doc. No. 1, at 7, ¶ 38.)  The FMLA provides "an eligible employee shall be entitled to 12 workweeks of leave during any twelve-month period" if the leave is requested for one of the purposes enumerated in the statute, including an employee's "serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  The statute makes it unlawful for an employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" under the statute.  29 U.S.C. § 2615(a)(1).

Defendant asserts that Parker cannot establish his right to twelve weeks leave and asserts that Parker has not established by the preponderance of the evidence that he suffered from a "serious health condition that makes the employee unable to

perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).

The defendant also argues that it would have fired Parker regardless of his FMLA request.  The City asserts that Parker had failed the Fire Academy because of his excessive absence from the program; and that it was the Academy, and not the City, that decided to fail Parker.  Parker argues that this is a <u>non sequitur</u>.

Although plaintiff's counsel has not clearly articulated how his client qualified for FMLA leave we believe that Parker would qualify for FMLA leave.  On the afternoon of September 25, 2002, Parker presented Kemp with a note from the Emergency Room that indicated he would not be able to return to normal duty until he was seen by his physician on September 30, 2002.  This was a sufficient request for leave under the FMLA.  <u>See</u> <u>Wilson v. Lemington Home for the Aged</u>, 159 F. Supp. 2d 186, 192 (W.D. Pa. 2001) (employee provided sufficient notice of FMLA request when she related to her supervisor that her physician advised her to stay home without specifying nature of illness and without noting it was an FMLA request).

Under the regulations "in all circumstances, it is the employer's responsibility to designate leave, paid or unpaid, as FMLA qualifying, and to give notice of the designation to the employee." 29 C.F.R. § 825.208(a).  The record is devoid of

discussions about the FMLA during Parker's meetings with the City or that written notice of his rights under the FMLA was sent following the meeting.  See 29 C.F.R. § 825.301 (discussing FMLA leave notices required to be provided by employer). A plaintiff may succeed with an FMLA interference claim where the employer fails to inform the employee of his rights under the FMLA if he is also able to show resulting prejudice.  Fogleman v. Greater Hazleton Health Alliance, 122 F. App'x 581, 587 (3d Cir. 2004).  The record reveals that no reasonable jury could find that Parker could show resulting prejudice.

Parker would not be able to return to his job after a twelve-week period without accommodation.  If Parker were to have taken a twelve-week period of leave he would have returned in December 2002 and without Academy certification. Certification from the Academy is a condition of employment and necessary for an individual to perform the essential functions of the job of firefighter.  The FMLA does not require "an employer to provide a reasonable accommodation to an employee to facilitate his return to the same or equivalent position at the conclusion of his medical leave."  Id. (quoting Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 384 (3d Cir. 2002).[9]  We agree with defendant that Parker's failure to complete the

---

[9]And as we note in the next section, Parker's request to enroll in the Spring course at the Academy could not be considered a reasonable accommodation.

16

Academy, a decision independently made by the Academy, prevents Parker from

succeeding with an FMLA claim.

## IV.  PARKER'S ADA CLAIM (COUNT II)

The ADA seeks to protect individuals with disabilities from discrimination by

employers.  See 42 U.S.C. § 12101(b).  Because Parker relies on indirect evidence,

he bears the initial burden of establishing a prima facie case of disability

discrimination under the burden-shifting framework of McDonnell Douglas Corp. v.

Green, 411 U.S. 792 (1973), by a preponderance of the evidence.  See St. Mary's

Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); Shellenberger v. Summit Bancorp,

Inc., 318 F.3d 183, 187 & n.5 (3d Cir. 2003); Bearley v. Friendly Ice Cream Corp.,

322 F. Supp. 2d 563, 574 (M.D. Pa. 2004).  To establish a prima facie case under

the ADA, Parker must demonstrate that he: (1) is disabled within the meaning of the

ADA; (2) was qualified to perform the essential functions of his job, with or

without accommodation; and (3) suffered an adverse employment decision because

of discrimination.  See Williams v. Phila. Housing Auth. Police Dep't, 380 F.3d

751, 761 (3d Cir. 2004) (citing Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306

(3d Cir. 1999)).  In order to make out a prima facie case, Parker must demonstrate

each of those elements by a preponderance of the evidence.  Walton v. Mental

Health Ass'n of Se. Pa., 168 F.3d 661, 668 (3d Cir. 1999).  In order to survive the

instant motion for summary judgment, Parker must demonstrate that there is sufficient evidence for a reasonable factfinder to find a prima facie case of discrimination.  Celotex Corp., 477 U.S. at 322-23 (Summary judgment is mandated when the nonmoving party "fails to make a showing sufficient to establish the existence of an essential element of that party's case, and on which that party will bear the burden of proof at trial.").  As we note for the following reasons, Parker has provided insufficient evidence to create a genuine issue as to a material fact, i.e., a prima facie case of discrimination.

The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); see 29 C.F.R. § 1630.2(g).  Importantly, simply having an impairment that does not substantially limit a major life activity is not a disability, and therefore is not covered by the ADA.  See Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 195 (2002).

Major life activities are defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."  29 C.F.R. § 1630.2(i).  Major life activities are "those basic activities that the average person can perform with little or no difficulty."  29 C.F.R. Pt.

1630, App. § 1630.2 (I).

A "substantially limiting" impairment is an impairment that renders an employee "unable to perform a major life activity that the average person in the general population can perform," or that significantly restricts the employee as to "the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j); see Toyota, 534 U.S. at 195-96. Pertinent factors for the court to consider include: "the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment."  29 C.F.R. §§ 1630.2(j)(2)(i)-(iii); see Toyota, 534 U.S. at 196.

"The question of whether an individual is substantially limited in a major life activity is a question of fact."  Williams, 380 F.3d at 763.  The Third Circuit follows the EEOC's interpretive guidelines to determine if a plaintiff is substantially limited in one or more major life activities; this approach necessitates that we conduct a two-step analysis.  Peter v. Lincoln Technical Inst., Inc., 255 F. Supp. 2d 417, 431 (E.D. Pa. 2002) (citing Mondzelewski v. Pathmark Stores, Inc., 162

F.3d 778, 783 (3d Cir. 1998).  Step one is to determine if the plaintiff is

substantially impaired in a major life activity other than working.  If the court finds

that the plaintiff is substantially impaired in the first step, then the inquiry ends.  If

not, then the court turns to the second step of determining whether the plaintiff is

limited in the major life activity of working.  Mondzelewski, 162 F.3d at 783; see,

e.g., Merit v. Se. Pa. Transit Auth., 315 F. Supp. 2d 689, 698 (E.D. Pa. 2004)

(Rufe, J.).

In his complaint plaintiff avers that he is "substantially limited in one or more

of his major life activities including, but not limited to, thinking, learning and

working."  (Rec. Doc. No. 1, at 8, ¶ 43.)  In his counter statement of material facts

plaintiff also notes in passing that his depression affects his sleeping.  (Rec. Doc.

No. 30-1, at 11, ¶ 81.)  Plaintiff's brief in opposition to defendant's motion for

summary judgment focuses only on the life activity of thinking, albeit it again

mentions in passing plaintiff's difficulty sleeping (Rec. Doc. No. 31, at 6.).[10]

---

[10]Numerous courts of appeals have found sleep to be a major life activity.

Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 644 (2d Cir. 1998);

E.E.O.C. v. Sara Lee Corp., 237 F.3d 349, 352 (4th Cir. 2001); Swanson v. Univ.

of Cincinnati, 268 F.3d 307, 316 (6th Cir. 2001); Heisler v. Metro. Council, 339

F.3d 622, 628 (8th Cir. 2003); McAlindin v. County of San Diego, 192 F.3d 1226,

1234-35 (9th Cir. 1999); Steele v. Thiokol Corp., 241 F.3d 1248, 1253 (10th Cir.

2001); Pack v. Kmart Corp., 166 F.3d 1300, 1305 (10th Cir. 1999); see also Rossi

v. Alcoa, Inc., 129 F. App'x 154, 158 (6th Cir. 2005); Cartwright v. Lockheed

Martin Util. Servs., Inc., 40 F. App'x 147, 153 (6th Cir. 2002); Boerst v. General

Mills Operations, Inc., 25 F. App'x 403, 406 & n.2 (6th Cir 2002).  Relying on the

case law of these other circuits, district courts within our circuit have applied the

substantial impairment analysis to the major life activity of sleeping.  Peter, 255 F.

Supp. 2d at 432-33; Popko v. Pa. State Univ., 84 F. Supp. 2d 589, 593 (M.D. Pa.

2000) (Caputo, J.); Reese v. Am. Food Serv., 2000 WL 1470212, *6 (E.D. Pa.

Sep. 29, 2000) (Waldman, J.).  We agree with the approach these courts took, and

therefore will also apply a substantial impairment analysis to Parker's case.

Plaintiff has provided the following evidence in support of his claim that he

has a sleep impairment: (1) an affidavit of plaintiff conducted after the close of

discovery and in response to the motion for summary judgment that states when

Parker is depressed he has "trouble sleeping" (Rec. Doc. No. 30-10, Ex. 9, at 2, ¶

5); (2) an Emergency Room report from September 25, 2002 that states plaintiff

has suffered from a several week history of "erratic sleep" (Rec. Doc. No. 30-4,

Ex. 3.); and (3) a January 24, 2003 office report from Dr. Schwab which indicated

Plaintiff does not brief an argument on the major life activity of learning, and we infer that to the extent he asserts that argument it is included within his argument on the life activity of thinking.[11]   Therefore, we now turn to Parker's argument that he

that "[s]leep in (sic) interrupted, awakes with concern on his mind, but able to fall back asleep."  (Rec. Doc. No. 30-11, Ex. 10, at 5.)

Parker's counsel has not provided to the court sufficient evidence to indicate that Parker's sleep was impaired.  Other than vague generalities, plaintiff has not introduced evidence about the extent of Parker's sleep impairment.  In fact, Dr. Schwab's report indicates that Parker has interrupted sleep, but is "able to fall back to sleep."  (Id.)  With such a sparse evidentiary record, we cannot find that a reasonable jury could find that plaintiff is substantially impaired in the major life activity of sleeping.  See, e.g., Heisler, 339 F.3d at 628;  Rossi, 129 F. App'x. at 158; Cartwright, 40 F. App'x at 153 (6th Cir. 2002).

[11]Plaintiff cites to Bennet v. Unisys Corp., No. 2:99-CV-0446, 2000 WL 33126583, *4 (E.D. Pa. 2000) (Vanantwerpen, J.), where the learned district judge analyzed the major life activities of thinking and concentrating together.  Part of the court's reasoning in Bennet was that the Third Circuit had not expressly recognized concentrating as a major life activity.  The Third Circuit has since expressly found that concentrating is a major life activity.  Gagliardo v. Connaught Laboratories,

is impaired in the major life activity of thinking.

Thinking is a major life activity.  Taylor v. Phoenixville Sch. Dist., 184 F.3d

296, 307 (3d Cir. 1999).  Concentrating and learning are also major life activities.

Gagliardo v. Connaught Laboratories, Inc., 311 F.3d 565, 569 (3d Cir. 2002).

Parker does not have to show an utter inability to think in order to survive a

summary judgment motion, Bennet v. Unisys Corp., No. 2:99-CV-0446, 2000 WL

33126583, *4 (E.D. Pa. 2000) (Vanantwerpen, J.), but Parker still must adduce

sufficient evidence such that a reasonable jury could find that he is substantially

impaired in the major life activity of thinking.

Plaintiff acknowledges that his diagnosis of depression and anxiety is not

enough to demonstrate that he is substantially limited in a major life activity.  See

Inc., 311 F.3d 565, 569 (3d Cir. 2002).

Nevertheless, we believe where plaintiff has only briefed an argument related

to thinking, that it is sound for us to analyze the major life activities of thinking,

learning, and concentrating together as they similarly relate to Parker's cognitive

function.  Furthermore, we note that whether the court analyzes the life activities

individually or collectively under the banner of "thinking," Parker has adduced

insufficient evidence for a reasonable jury to find him substantially limited in the

major life activities of thinking, learning, or concentrating.

Toyota, 534 U.S. at 195 ("Merely having an impairment does not make one disabled for purposes of the ADA." ).  To support his claim that he is limited in the major life activity of thinking, besides the September 25, 2002 diagnosis, Parker offers: (1) an affidavit by Parker, offered in response to the motion for summary judgment and after the close of discovery, that indicates when Parker experiences an anxiety attack he cannot concentrate, he is unable to focus on anything but his fears, and when suffering an extreme attack he cannot breathe, becomes shaky, and lightheaded (Rec. Doc. No. 30-10, at 3, ¶¶ 3-4.); (2) the September 25, 2002 Emergency Room report which indicates Parker has a several week history that includes "poor concentration" (Rec. Doc. No. 30-4, at 4.); (3) Parker's deposition testimony  indicating he believed he suffered a panic attack some time in 2000 while driving home from work in Lock Haven (Rec. Doc. No. 30-5, at 5.)[12]; (4) Parker's deposition testimony that on the morning of September 25, 2002, while driving on the way to the Academy he had thoughts about running his jeep into a tree or

_____

[12]Because of panic attack, Parker testified that he had to pull off the road and then he called an ambulance which took him to Jersey Shore Hospital.  (Rec. Doc. No. 30-5, at 5.)  Parker believes they gave him Ativan.  (Id.)  We note that plaintiff's counsel has not provided the court with medical records from this incident.

anything he could do to hurt himself (Rec. Doc. No. 30-5, at 10.); and (5) two

medical reports from office visits in 2003 (one September 9, 2003 office report

from a Dr. Quinn Kirk indicates that Parker has better control of his anxiety with his

medication (Rec. Doc. No. 30-8, Ex. 7, at 4.); the other report dated September 9,

2003 is by clinical social worker Barbara Hemmendinger and indicates that Parker

has responded very favorably to several sessions of cognitive-behavior therapy

along with prescription medicine and that his "anxiety disorder is very well

controlled and that he is entirely capable from a psychological perspective of

performing full-time duties as a firefighter or in any vocation of his choosing."

(Rec. Doc. No. 30-9, Ex. 8, at 3.)).[13]

Plaintiff contends that the fact that he suffers only episodic attacks is not

enough to defeat his claims and cites to Pinson v. Berkley Med. Res., Inc., No. 03-

CV-1255, 2005 U.S. Dist. LEXIS 13045 (W.D. Pa. June 21, 2005).  We

acknowledge that episodic impairments if serious enough could limit a major life

---

[13]Parker also has submitted a September 30, 2002 letter from Dr. Schawb to

Kemp stating that Parker was currently being treated for a medical condition that

would preclude him from participating in the Academy until further notice.  (Rec.

Doc. No. 23-17, Ex. Q.)  Parker had already failed the Academy as of September

25, 2002.  (Rec. Doc No. 23-26, Ex. Z.)

activity.  See Taylor, 184 F.3d at 309 ("Chronic, episodic conditions can easily

limit how well a person performs an activity as compared with the rest of the

population.").

Parker's case, and the evidence he relies on to advance it, is distinguishable

from Taylor and Pinson.  The district court in Pinson noted that the plaintiff had

not sought "medical advice as frequently as the plaintiff in Taylor, the number of

Pinson's counseling sessions is not insubstantial and could be viewed by a

reasonable factfinder as evidence of a persistent serious condition."  Pinson, 2005

U.S. Dist. LEXIS 13045, *27.  The plaintiff in Pinson had evidence demonstrating

that during a seventeen-month period while she was employed she attended 18

counseling appointments in connection with her depression and anxiety.  Id.  The

plaintiff in Taylor had sought medical treatment 25 times during the academic year.

Taylor, 184 F.3d at 309.  In contrast, at this point the factual record is completely

developed and Parker has offered but a mere scintilla of evidence that he suffered

from a serious mental condition when he was employed by the City.[14]  Parker has

_____

[14]The evidence, including Parker's most recent affidavit, indicates that Parker

can now control his panic attacks with medication and relaxation techniques.  See

(Rec. Doc. No. 30-8, Ex. 7, at 4 & Rec. Doc. No. 30-9, Ex. 8, at 3).  A court must

consider these sorts of corrective measures when determining whether plaintiff is

not adduced sufficient evidence so that a reasonable factfinder could find that he had a persistent serious condition.

Having evaluated Parker's claim that he is substantially limited in the major life activity of thinking, we now turn to  the second step in our analysis, determining whether Parker is substantially limited in the major life activity of working. Plaintiff's counsel wholly fails to advance an argument that Parker is substantially impaired in the major life activity of working.

In order to advance an argument that he was substantially impaired from the major life activity of working, plaintiff's counsel would have had to have submitted evidence of Parker's work-related abilities and qualifications, the jobs available in his geographic area, the number of jobs utilizing his particular abilities and the number of those jobs from which he is disqualified due to his impairments (i.e., he is restricted from a class of jobs), or the number of jobs that do not utilize his particular abilities and the number of those jobs from which he is disqualified due to his impairments (i.e., he is restricted from a broad range of jobs in various

---

substantially impaired.  Sutton v. United Air Lines, Inc., 527 U.S. 471, 488 (1999); Fiscus v. Wal-Mart Stores, Inc., 385 F.3d 378, 385-86 (3d Cir. 2004).   Plaintiff's testimony only suggests to the court that if he treats with medication he can improve his condition.

classes).  29 C.F.R. § 1630.2(j)(3)(ii)(A)-(C); see Merit, 315 F. Supp. 2d at 700-01.

Plaintiff has presented none of this evidence and therefore no reasonable jury could

find Parker substantially impaired in the major life activity of working.  Id. at 701.

Parker cannot establish a prima facie case of discrimination under the ADA

because he has not demonstrated to the court that he is substantially impaired in

any major life activity.[15]

---

[15]Furthermore, we note that Parker cannot perform the essential functions of

the job with or without reasonable accommodation.  As plaintiff's complaint

acknowledges (Rec. Doc. No. 1, ¶ 16), and Parker was made aware during his

Summer 2002 interview, completing and graduating the Academy was a condition

of employment with the City in order to be a permanent firefighter.  Parker failed

the Academy and the City deemed passage of the course an essential function of

the job.

Parker asserts that the City could have accommodated him by allowing him

to take the Spring Academy or for the City to request the Academy to hold a

separate session for him at another time.  Parker's proposal does not constitute a

reasonable accommodation.  A plaintiff must demonstrate "that the costs

associated with his proposed accommodation are not clearly disproprotionate to

the benefits it will produce."  Gaul v. Lucent Techs. Inc., 134 F.3d 576, 580-81 (3d

## V.  PARKER'S REHABILITATION ACT CLAIM (COUNT III)

Section 504 of the Rehabilitation Act of 1973 protects qualified individuals with a disability from discrimination.  29 U.S.C. § 794(a).  The Rehabilitation Act applies to employers who receive federal financial assistance.  Id.  The text of the Rehabilitation Act provides that the standards used to determine employment discrimination under the Rehabilitation Act are the standards set forth in the ADA.  29 U.S.C. § 794(d); see Donahue v. Consol. Rail Corp., 224 F.3d 226, 229-230 (3d Cir. 2000).  Based on our analysis of Parker's ADA claim, the court will grant defendant's motion for summary judgment on plaintiff's Rehabilitation Act claim.

## VI.  PARKER'S PHRA CLAIM (COUNT IV)

The Pennsylvania Human Relations Act forbids "any person, employer, employment agency, labor organization, or employee, to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice."  43 Pa. C.S.A. § 955(e).  Courts interpret the PHRA's

―――――――――

Cir. 1998) (internal quotations omitted).  Allowing Parker to take the Academy at another time when the City was not aware whether it would have the funds to send another officer, and had already paid Parker's tuition once would not be reasonable.

provisions identically with the corresponding provisions of the ADA and ADEA.

Kautz, 412 F.3d at 466 n.1;  Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 382 (3d

Cir. 2002) (citing Kelly v. Drexel University, 94 F.3d 102, 106 (3d Cir. 1996));

Buskirk v. Apollo Metals, 307 F.3d 160, 166 n.1 (3d Cir. 2002).   Therefore,

because we find that defendant is entitled to summary judgment on plaintiff's ADA

claim, Parker's PHRA claim on the basis of a disability fails.

## VI.  PARKER'S SECTION 1983 DUE PROCESS CLAIM (COUNT V)

Plaintiff asserts a claim pursuant to 42 U.S.C. § 1983 on the basis of an

alleged constitutional violation of the Due Process Clause of the Fourteenth

Amendment.   Initially plaintiff asserts defendants violated both his procedural and

substantive rights under that clause.[16]  Section 1983 provides:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State . . .  subjects,
> or causes to be subjected, any citizen of the United States
> or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to
> the party injured in an action at law, suit in equity, or
> other proper proceeding for redress . . .

---

[16]In Parker's brief in opposition he withdrew his section 1983 claim alleging a

violation of his rights protected by substantive due process.  (Rec. Doc. No. 31, at

16 n.1).

42 U.S.C. § 1983.

In order for a plaintiff to prevail under 42 U.S.C. § 1983 he must establish two elements: 1) that the conduct complained of was committed by a person acting under color of state law; and 2) that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. Kost, 1 F.3d at 184.

Defendant asserts in its motion for summary judgment that plaintiff has not adduced sufficient evidence as to the second element in order to survive summary judgment.

### A.  Parker's Fourteenth Amendment Procedural Due Process Claim

Parker alleges that defendant violated procedural due process by failing and refusing to provide him with a pretermination hearing, i.e., notice of the charges against him and an opportunity to be heard.  For the following reasons plaintiff fails to provide sufficient evidence upon which a reasonable fact finder could rule in his favor at trial on the basis of procedural due process.

First, we must determine whether the plaintiff has a constitutionally protected property or liberty interest.  Bd. of Regents v. Roth, 408 U.S. 564, 572, 576 (1972).  The individual interests to which procedural due process applies are those protected by the Constitution.  Id. at 572.  The Third Circuit has articulated those

as the individual interests embraced by the "fourteenth amendment's protection of life, liberty, or property."  Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000).  As to Parker's contention that he has a protected property interest in his continued employment with the city, the United States Supreme Court has instructed that the Constitution is not the source of the property interests which are afforded procedural due process protections.  Roth, 408 U.S. at 577.  "Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law - rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  Id.; see also Ruiz v. New Garden, 376 F.3d 203, 206 (3d Cir. 2004) ("State law defines property interests for purposes of procedural due process claims.")

Individuals are afforded constitutional protection under procedural due process only for legally cognizable property interests, not property interests that plaintiffs simply have an "abstract need or desire for."  Roth, 408 U.S. at 577.  Due process requires protection of only those property interests of a "legitimate claim of entitlement to an asserted right, or, in other words, an enforceable expectation governed by statute or contract."  Rossi v. Com., Pa. State Police, 515 A.2d 120, 121-122 (Pa. Commw. 1986) (citations omitted).

Parker contends that Pennsylvania's Fireman's Civil Service Act of the Third Class City Code, 53 Pa. C.S.A. § 39863,  provides him with a protected property interest in his position as a fire department appointee.  That portion of the code reads in relevant part, as follows:

> All original appointments to any positions in the fire department and as fire alarm operators and fire box inspectors, within the terms of this act, shall be for a probationary period of six months. During such probationary period the appointee shall not be denied any rights or benefits that the appointee would otherwise be entitled to under any collective bargaining agreement. <u>At any time during the probationary period, the appointee may be dismissed for just cause, in the manner provided in section ten of this act.</u>  If at the close of such probationary term the conduct or capacity of the probationer has not been satisfactory to the appointing officer, the probationer shall be notified, in writing, that he will not receive permanent appointment, whereupon his employment shall cease; otherwise, his retention in the service shall be equivalent to his permanent appointment.

53 Pa. C.S.A. § 39863 (emphasis added).

The code clearly provides that during the probationary period an appointee may be dismissed "for just cause."  The just cause provision in the state law provides Parker with a Fourteenth Amendment protected property interest in his continued employment as a probationary firefighter.  See <u>Linan-Faye Const. Co., Inc.</u>, 49 F.3d 915, 932 (3d Cir. 1995); <u>Solomon v. Philadelphia Housing Auth.</u>, 143

33

F. App'x 447, 452 (3d Cir. 2005); <u>Belas v. Juniata County School Dist.</u>, No. 1 CV-04-505, 2005 WL 210066 (M.D. Pa. Aug. 26, 2005) (Kane, J.).

The Due Process Clause requires "that an individual be given some opportunity for a hearing <u>before</u> he is deprived of any significant property interest." <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 542 (1985) (quoting <u>Boddie v. Connecticut</u>, 401 U.S. 371, 379 (1971) (emphasis in original)). "This principle requires 'some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment." <u>Id.</u> (citing <u>Roth</u>, 408 U.S. at 569-70). The purpose of the pretermination hearing is to "be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." <u>Id.</u> at 545-546 (citing <u>Bell v. Burson</u>, 402 U.S. 535, 540 (1971)).

A pretermination hearing for an employee with a protected property interest must include "oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story." <u>Id.</u> at 546; <u>see also</u> <u>McDaniels v. Flick</u>, 59 F.3d 446, 454 (3d Cir. 1995). Due process is flexible and calls for protections as the particular situation demands.

Morrissey v. Brewer, 408 U.S. 471, 481 (1972).  Therefore, notice need not be in advance, so long as the timing of the notice does not deprive the employee from telling his side of the story.  See Gniotek v. City of Philadelphia, 808 F.2d 241, 244-45 (3d Cir. 1986), cert. denied, 481 U.S. 1050 (1987).  The contents of pretermination notice need not be in great detail as long as it allows the employee the "opportunity to determine what facts, if any, within his knowledge might be presented in mitigation or in denial of the charges."  McDaniels, 59 F.3d at 457 (quoting Gniotek, 808 F.2d at 244).

The core of plaintiff's Due Process argument is that it was a foregone conclusion that he was going to lose his job and that this was communicated to him at the September 25, 2002 meeting.[17]  He notes that both meetings were very short in duration and that therefore he was not afforded a meaningful opportunity to be heard at either meeting.  Parker asserts that due process required that the City take more time prior to Parker's termination.

_____

[17]We note that plaintiff did not contradict defendant's stated purpose for the September 25, 2002 meeting in his responsive statement of material facts (Rec. Doc. No. 30-1, at 6, ¶ 44), despite plaintiff's suggesting otherwise in his brief in opposition (Rec. Doc. No. 31, at 18.).

We disagree.  Parker admits he was given an opportunity to respond after he was presented with the pre-prepared termination memo on October 1, 2002.  By that date, Kemp had been informed by Pierich that Parker had failed the Academy. (Rec. Doc. No. 23-26, Ex. Z.)  Parker had an opportunity to address the reasons for his dismissal at that time and declined to do so.  Parker was afforded his constitutional due process right to a pre-deprivation hearing at the October 1, 2002 meeting.  Parker was also entitled to a post-deprivation hearing if he so sought, but that issue is not before the court.

**CONCLUSION:**

For the aforementioned reasons the court will issue an accompanying order entering judgment in favor of the defendant City of Williamsport and against plaintiff Casey Parker as to all counts.


    s/ James F. McClure, Jr.
James F. McClure, Jr.
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CASEY PARKER,                    :
                                 :          Case No. 4:04-CV-2144
         Plaintiff,              :
                                 :
     v.                          :
                                 :          (Judge McClure)
CITY OF WILLIAMSPORT,            :
WILLIAMSPORT BUREAU              :
OF FIRE,                         :
                                 :
         Defendants.             :

**O R D E R**

December 21, 2005

For the reasons set forth in the accompanying memorandum,

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.   Defendant's motion for summary judgment is granted.  (Rec. Doc.
     No. 21.)

2.   Final judgment is entered in favor of defendant City of Williamsport,
     and against plaintiff Casey Parker, as to all counts.

3.      The clerk is directed to close the case file.

    s/ James F. McClure, Jr.

James F. McClure, Jr.

United States District Judge